FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 APR 10 PM 1:27

U.S. DISTRICT COURT
N.D. OF ALABAMA

|                                         |     |                     |
| --------------------------------------- | --- | ------------------- |
| WILLIE GRANT,                           | )   |                     |
|                                         | )   |                     |
|         Plaintiff,                      | )   |                     |
|                                         | )   | CIVIL ACTION NO.    |
| v.                                      | )   |                     |
|                                         | )   | CV-96-AR-0980-S     |
| HEALTHSOUTH CORPORATION                 | )   |                     |
| d/b/a LAKESHORE                         | )   |                     |
| REHABILITATION HOSPITAL,                | )   |                     |
|                                         | )   |                     |
|                                         | )   |                     |
|         Defendant.                      | )   |                     |

ENTERED

APR 1 0 1997

### MEMORANDUM OPINION

Pursuant to a February 13, 1997, order, this court permitted defendant and plaintiff to submit cross-motions for summary judgment pertaining to the issue of who are the proper parties in the above-entitled cause. The only named defendant, HealthSouth Corporation ("HealthSouth"), submitted a motion for summary judgment. Yet, both litigants have thoroughly addressed the proper parties issue.[1] For the reasons hereinafter articulated, this court determines that HealthSouth cannot be held liable for acts of

---

[1]Plaintiff and HealthSouth, in addition to briefs and evidence filed in response to HealthSouth's motion for summary judgment, also filed briefs and evidence relating to "plaintiff's motion for summary judgment." No such motion was ever filed by plaintiff. The court did, however, consider the arguments in the briefs and the accompanying evidence. The arguments and evidence largely duplicate the briefs and evidence filed in regard to HealthSouth's motion.

1

37

its current subsidiaries or of Lakeshore Foundation f/k/a the
Jefferson Tuberculosis Sanitorium d/b/a Lakeshore Hospital
("Foundation").   Accordingly, HealthSouth's motion for summary
judgment is due to be granted.

### A. Pertinent Facts and Procedural Posture

Plaintiff, Willie Grant ("Grant"), began work in the
environmental services department of Lakeshore Hospital
("Hospital") sometime in 1986.   On October 1, 1986, Foundation, as
"owner" of Hospital, entered into a management-consultant agreement
with Lakeshore Systems Services, Inc. ("LSSI").   By contract, LSSI
was deemed "manager" of Hospital.   According to the agreement,
"full authority and ultimate control of Hospital's operations and
standards of medical care remain[ed] with [Foundation]." (Def. Ex.
D at 1).   However, as manager, LSSI was responsible for, among
other things, hiring, promoting, discharging and supervising the
work of all operating and service employees of Hospital. *Id*.   While
LSSI acted in Foundation's name, the agreement provided that "all
employees [were] on the Hospital payroll and [were] not [to] be
considered agents or employees of [LSSI]."   Furthermore, all
medical and professional matters, including staff admissions, were
the responsibility of Foundation and the medical staff. *Id*. at 2,
8.   LSSI was not to be liable for the payment of wages, payroll

2

taxes or other expenses of employment of any person employed by Foundation or furnished by LSSI. *Id*. at 15. The management fee payable to LSSI was fixed for the first year and was thereafter adjusted according the consumer price index. *Id*. at 10.  Foundation retained the right to  terminate the management agreement if LSSI inadequately performed its duties. *Id*. at 12-13.   LSSI and Foundation specifically disclaimed any intention to be either partners or joint venturers in Hospital. *Id*. at 17.   LSSI was Foundation's agent, but only for those things specifically set forth in the management agreement. "Both parties agree[d] that neither [Foundation] nor [LSSI] [were] controlled by the other directly or indirectly." *Id*. This agreement, after its renewal, was to terminate on September 30, 1996.

On October 1, 1994, LSSI and Foundation superseded their previous management agreement when LSSI become the lessee of Hospital.  For purposes of HealthSouth's motion only, the court will assume that after October 1, 1994, LSSI was an "employer" of Hospital personnel.  On August 18, 1994, one and one half months before the management agreement was superseded, Grant resigned from Hospital.  On October 29, 1994,  the EEOC sent a notice of a charge of discrimination to the CEO of "Lakeshore Hospital."  This notice

3

shows that Grant alleged race discrimination and retaliation in violation of his statutory Title VII rights.

At some time between September 18, 1994, and December 31, 1994, but after plaintiff had resigned, a subsidiary of HealthSouth merged with ReLife, Inc.,("ReLife"), a 100% shareholder of LSSI. (Def. Ex. H).   Post-merger, HealthSouth became the a 100% shareholder of ReLife, which in turn was the 100% owner of LSSI.

On October 24, 1995, a right-to-sue letter was issued to plaintiff by the EEOC.   On January 22, 1996, Grant filed the present action in the Circuit Court of Jefferson County, Alabama, against "HealthSouth Corporation d/b/a Lakeshore Rehabilitation Hospital" alleging racial harassment and retaliation.   On April 18, 1996, "HealthSouth Corporation d/b/a Lakeshore Rehabilitation Hospital" removed the case to this court.   In its answer of April 23, 1996, HealthSouth first claimed that it had never done business as "Lakeshore Rehabilitation Hospital."   On May 1, 1996, this court denied   HealthSouth's 12(b)(6) F.R.Civ.P. motion to dismiss.   On July 1, 1996, plaintiff added as a party to the action "Lakeshore Rehabilitation Hospital."   In answer to that amended complaint HealthSouth again reiterated that it had never done business as Lakeshore Rehabilitation Hospital and furthermore alleged that there is no legal entity known as "Lakeshore Rehabilitation

4

Hospital." HealthSouth nevertheless answered for Lakeshore Rehabilitation Hospital "to the extent Plaintiff intended to name HealthSouth or any of its subsidiaries as Defendants." Only July 24, 1996, the court denied HealthSouth's second 12(b)(6) motion. Upon request of all litigants to this action and because the court determined the need, if possible, to determine the proper parties to this action, the court, on February 13, 1997, established a briefing schedule and invited litigants to submit materials relating to proper parties. It is that issue alone that is now before the court.

### B. Summary Judgment Standard

Rule 56 states, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

F. R. Civ. P. 56(c). As stated by the Eleventh Circuit, "[s]ummary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994).

5

## C. Legal Analysis

HealthSouth argues that is not now, as a 100% shareholder of

ReLife which is in turn a 100% shareholder of LSSI, nor has it ever

been, an "employer" of LSSI's current or past employees pursuant to

Title VII and 42 U.S.C. § 1981.[2] The first step in an analysis of

whether HealthSouth is liable for claims against LSSI by Grant, is

to determine whether LSSI was ever liable to Grant as his

"employer" under Title VII.

It cannot be seriously disputed that Foundation employed

plaintiff.[3] Foundation paid Grant's salary and maintained ultimate

---

[2] Title VII only allows plaintiff to sue an "employer" for alleged
discriminatory conduct.  While commonly asserted together, 42 U.S.C. § 1981
provides a separate and distinct cause of action. Section 1981 prohibits public or
private racial discrimination, but only insofar as this discrimination relates to
the formation and enforcement of contracts. *See Winbush v. State of Iowa* , 66 F.3d
1471, 1476-77 (8th Cir. 1995); *Fitzgerald v. Mountain States Telephone and
Telegraph Co.,* 68 F.3d 1257, 1263 (10th Cir. 1995). The court is unwilling to
follow defendant's suggestion to treat the statutes in almost all cases as exactly
the same.  For example, the court would be unwilling, without further direction
from Congress, the Supreme Court or the Eleventh Circuit, to find an
administrative exhaustion requirement for § 1981 actions. *See Winbush*, 66 F.3d at
1486. However, as defendant correctly asserts, plaintiff must be able to establish
some contractual link with LSSI to pursue a § 1981 action.  For the purposes of
this action the contractual link disputed is the employer/employee relationship.
The determination of whether defendant is an "employer" for purposes of Title VII
will, for the issue currently before the court, be determinative of the § 1981
claim.  Plaintiff seemingly abandons his § 1981 cause of action in his brief, and
discusses only Title VII; therefore, this court finds that plaintiff has acceded
to HealthSouth's characterization of the issue and contests only actions that
occurred within the scope of an employer/employee contract. Therefore, for
purposes of addressing the issues raised in the current motion for summary
judgment only, this court will treat the statutes as the same.

[3] Plaintiff does unsuccessfully attempt to argue this point. "The plaintiff
has not, and does not now, attempt to argue that LSSI and the Foundation are a
single or joint employers of the Plaintiff." (Pl. response to def. motion for
summary judgment at 4). Plaintiff contends, as far as this court can determine,

6

authority over his employment status.  Indeed, as defendant notes,

a similar contractual relationship exited between a manager and a

hotel owner in *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350

(11th Cir. 1994).  While that case was factually different in that

the employee/plaintiff was undisputedly the employee of the

manager[4], the hotel owner, who paid the employee's salary, retained

some control over hiring decisions and maintained ultimate

authority and control over any labor negotiations with employees,

was considered to be a Title VII employer.  *Id.* at 1360.  In the

present case, Foundation maintained these responsibilities, among

---

that LSSI was his sole employer. For reasons stated *infra,* this is not the case.
Plaintiff never addresses what role Foundation had in his employment relationship;
rather, he simply assumes such a relationship away. The court expresses no opinion
on whether plaintiff would have been required to join Foundation to this action
pursuant to Rule 19, given the determination that Foundation is his employer, or
whether he was free to choose his target defendant.  Nevertheless, this court does
determine that whether or not Foundation is an indispensable party, it certainly
is a relevant entity to this law suit, whether or not it has appeared.  The facts
of plaintiff's relationship with Foundation cannot be simply assumed away because
plaintiff chose to sue only HealthSouth.

[4]As discussed *infra,* this factual distinction is extremely important. The
*Virgo* court, noted that under a joint employer theory, that an employer, who
employs a management company and who pays the management company 's employee's
salary and has significant control over that employee is the employee's employer.
However, in the present case, the manager is merely an employee, albeit an
important one, of Foundation in the same sense that any normal individual
supervisor is an employee in a typical Title VII case. While the employer can be
held vicariously liable for the discriminatory actions of the supervisor, the
supervisor is not typically individually liable for acts of discrimination. *See*
*Cross v. State of Alabama,* 49 F.3d 1490, 1504 (11th Cir. 1995). If this were not
the case then almost any management company hired to run a business would be
liable under Title VII for discrimination, when an individual supervisor would
not, even where the persons complaining of discrimination were employees of the
business the manager was hired to run.

7

others, with regard to Hospital's employees. Accordingly, plaintiff must show that LSSI is a "joint employer", that it has "successor liability", or that LSSI somehow interfered with plaintiff's employment opportunities.

## 1. Joint Employers

"A 'joint employer' relationship is different from, though sometimes confused with, a 'single employer situation." *Virgo*, 30 F.3d at 1360 n.6. (citing *Clinton's Ditch Co-op. Co., Inc. v. National Labor Relations Bd.*, 778 F.2d 132, 137 (2d Cir. 1985), *cert. denied,* 479 U.S. 814, 107 S. Ct. 67 (1986)).

> A "single employer situation exists "where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer'". *Browning-Ferris Industries,* 691 F.2d at 1122. The singe employer standard is relevant when "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a 'single enterprise'". *See NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402, 80 S. Ct. 441, 443, 4 L. Ed. 2d 400 (1960).
>
> In contrast, in a "joint employer" relationship, there is no single integrated enterprise. A conclusion that employers are "joint" assumes that they are separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly. *Browning-Ferris Industries,* 691 F.2d at 1122.

*Clinton's Ditch Co-op Co., Inc. v. National Labor Relations Bd.,* 778 F.2d 132, 137 (2d Cir. 1985), *cert. denied,* 479 U.S. 814, 107

S. Ct. 67 (1986). Factors commonly utilized in determining joint employer status include: (1) interrelation of operations of the two independent companies; (2) centralized control of labor relations; (3) common management; and (4) common ownership of financial control. *See Virgo,* 30 F.3d at 1359-60 n.6; *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir. 1987)("The predominant trend in determining whether two businesses should be treated as a single or joint employer under § 2000e(b) is to apply the standards promulgated by the National Labor Relations Board (NLRB).")(citing cases); *Armbruster v. Quinn,* 711 F.2d 1332, 1337 (6th Cir. 1983)(citing cases). "While each factor is indicative of interrelation and while control over the elements of labor relations is a central concern, the presence of any single factor in the Title VII context is not conclusive." *Armbruster*, 711 F.2d at 1337. Accordingly, a "facts and circumstances" test, rather than a rigid application of the standards, is often employed to effectuate Title VII's liberal and remedial purpose. *See id*. at 1336-38. In the present case, even a liberal application of the standards cannot allow this court to find that LSSI and Foundation were "joint employers."

There is no evidence showing that there was common management,

9

common ownership or financial control of the separate entities, LSSI and Foundation.  LSSI simply contracted with Foundation, as a separate entity, to run Foundation's business. The fact that LSSI later took over the business when it leased the premises does not change the fact that at the time the allegedly discriminatory conduct took place, and even after, no such relationship existed. Furthermore, there was no interrelation of the operations or centralized control of labor relations of LSSI and Foundation. Both corporations existed separately and distinctly, and had separate bases of control.  LSSI and Foundation's operations were "interrelated" only to the extent that LSSI and Foundation entered into a management agreement for one hospital.  In the same vein, there was no centralized control of labor management.

> In the labor law field from which it is drawn, this phrase ["centralized control of labor management"] has reference to the existence, or lack thereof, of a single source which controls or has the authority to control various labor related matters, such as hiring and firing of employees, wage scales and conditions of work, for two or more nominally distinct entities.  As applied in the context it would require a finding that [LSSI] either made, or had the authority to make, decisions of that nature both for its own employees and for those of [Foundation].

*Massey v. Emergency Assistance, Inc.*, 580 F. Supp. 937, 942 (W.D. Mo. 1983), *aff'd,* 724 F.2d 960 (8th Cir. 1984), *cert. denied,* 469

U.S. 93, 105 S. Ct. (1984).  While LSSI could hire and fire certain personnel, the ultimate responsibility of these employment decisions was, by contract, laid at the feet of Foundation.  Many of the joint employer cases this court has reviewed, deal with employees attempting to attach liability to a contractor who hires a subcontractor, an owner who hires a manager, or a parent who owns a subsidiary.  These cases recognize that simply because an owner, contractor, or parent employs another company and delegates to it the sole responsibility to supervise employees, the contractor, manager or parent cannot avoid employer liability <u>where it</u> <u>maintains sufficient control to affect the terms and conditions of</u> <u>employment</u>. *See Virgo*, 30 F.3d at 1360 (citing *National Labor Relations Board v. Browning-Ferris Industries*, 691 F.2d 1117, 1122 (3d Cir. 1982)).  However, this court has found only one case dealing with a manager who expressly disclaimed joint employer status. *See Equal Opportunity Employment Commission v. Sage Realty, Corp.*, 507 F. Supp. 599, 611 (S.D.N.Y. 1981).  The district judge in *Sage Realty,* citing himself, found that the term "employer"

  has been construed in a functional sense to encompass persons who are not employers in conventional terms but who nevertheless control some aspect of an employee's compensation or terms, conditions, or privileges of employment. *Spirit v. Teachers Insurance and Annuity Ass'n,* 475 F. Supp. 1298, 1307-08 (S.D.N.Y. 1979).

11

> Although Hasselman [plaintiff] was on the payroll of
> National [the real employer] from January 1973 through
> October 31, 1975, until her discharge on June 4, 1976,
> Sage [the "manager employer"] exercised considerable
> control over the terms and conditions of her employment.
> Sage hired, trained, and supervised Hasselman, and
> ultimately ordered her discharge. Sage controlled the
> uniform policy challenged here.  The Court finds that
> Sage was a joint employer of Hasselman within the meaning
> of Title VII and is liable . . . for the violation of
> section 703(a).

*Id.* Because the court is not bound by the Southern District of New

York, and because this court is not persuaded by that court's

reasoning, it declines to follow *Sage Realty*. It would seem

anomalous for the court to find a "joint employer" relationship in

this case, even where LSSI supervised, hired, and fired certain

employees, when such an obligation arose from a contract where LSSI

was hired to do these things and where it could not otherwise

affect pay and other aspects of the employment relationship. *Cf.*

*Massey*, 580 F.2d at 942 ("It is true that the contract . . .

incorporated rather pervasive and detailed guidelines within which

Emergency Assistance was obliged to operate in its employee

relations.  These obligations, however, were the product of a

contractual relationship, and the City . . . had no unilateral

ability to change them as it might see fit, or to exert control

beyond them."). If the court did so hold, then <u>all</u> supervisors and

individual managers of more than fifteen employees would similarly be considered "joint employers".

In the present case, it appears that LSSI was an agent of Foundation, and that through this agency relationship, Foundation might have been held liable for LSSI's actions, or inactions, at Hospital, though not for actions at another LSSI management site. For whatever reason, plaintiff chose not to sue Foundation. Instead, he chose to sue HealthSouth, the "grandparent" of LSSI. Even if HealthSouth could be held liable for LSSI's actions, which it cannot, LSSI is not liable as a joint employer in this case. The court notes that plaintiff does not even argue for "joint employer" liability. Rather, Grant simply wishes for the court to ignore Foundation's role in his employment, and argues that LSSI is his sole employer. This he cannot successfully do. If the court had any reason to believe that HealthSouth was playing a shell game with Grant, this court would be willing to innovate a stop to it, but there is no such evidence of a "corporate veil". *See infra*.

### 2. Successor Liability

For purposes of this motion, the court will assume that LSSI became an "employer" of persons retained at Hospital when it began its lease of those premises on October 1, 1994. (Pl. Ex.18, Lease Agreement ¶ 24.10; Pl. Ex. 19, Wade Depo. at 27-29). LSSI did not

13

assume such a role until almost two months after Grant quit his job.  Defendant argues that even if LSSI became an employer at Hospital site shortly after it leased those premises, it is not a successor to Foundation's liability for Grant's claim of racial harassment. Plaintiff does not address this point. Plaintiff only argues that HealthSouth is a successor to LSSI's liability, and assumes LSSI's successor liability to Foundation.  This he cannot do.  He must, as discussed earlier, establish some link between LSSI and Foundation.

"As a general rule, a corporation that purchases or otherwise acquires the assets of a second corporation does not assume the debts and liabilities of the second corporation." *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1456 (11th Cir. 1985)(citing cases).  The exceptions to this rule include instances where: (1) an asset buyer's expressly or impliedly agrees to assume the debts; (2) the asset acquisition amounts to a "de facto merger"; (3) the buying corporation is a "mere continuation of the selling corporation; or (4) the transaction was a fraudulent one used to escape liability. *See id.*  There is also a limited exception in the case of employment discrimination and labor relations. *See Preyer v. Gulf Tank & Fabricating Co., Inc.*, 826 F. Supp. 1389,

14

1395 (N.D. Fla. 1993)(citing cases). "All [five] of these exceptions require a transfer of assets in order to hold the acquiring corporation liable." *Bud Antle, Inc*. 758 F.2d at 1457. While there was a lease agreement, there is no evidence here that such a transfer of assets occurred; but, since defendant seems to concede that such a transfer occurred, and was the only party to raise the issue of successor liability between LSSI and Foundation, the court will do so as well. Perhaps defendant does not contest this point because the "lease" is actually a "sale" for all practical purposes.

> In applying the successor liability doctrine, a court must balance the public interest in the enforcement of congressionally established national labor policies against the public interest in maintaining and encouraging the free flow of capital as well as the limited liability principle of corporations. In striking this balance, the court must consider several factors.

> First, the court must consider whether the successor employer had prior notice of the claim against the predecessor. Second, the court must look at whether the predecessor is able, or was able prior to the purchase, to provide the relief requested. Finally, the court must determine whether there has been sufficient continuity in the business operations of the predecessor and the successor to justify imposition of liability.

*Preyer*, 826 F. Supp. at 1395 (citations omitted). "The main rationale underlying the imposition of successor liability is that an employee's statutory rights should not be vitiated by the mere

15

sudden change in ownership of the employer's business." *Id*. Even so, "[i]t would be grossly unfair . . . to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief . . . ." *Id*. at 1398 (quoting *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985)).

With regard to the second factor, it is apparent that Foundation, which is still in business and which receives money in the form of rent of $2,000,000.00 per year from defendant, is viable and capable of affording plaintiff an adequate remedy. (Def. Ex. B, Lease Agreement at Article III). While it could not reinstate him to his previous position, it could provide back pay and other monetary relief. While defendant has shown that Grant could receive an adequate remedy from Foundation, plaintiff has offered nothing to show otherwise. Accordingly, this court determines that LSSI is not liable as a "successor" to Foundation. Similarly, addressing plaintiff's point, HealthSouth cannot be a "successor" simply because it is an indirect shareholder of all of LSSI's stock. Like Foundation, LSSI still exists, and has the ability to afford plaintiff complete relief. Any equities balanced between the interests of the employer and the interests of the employee in this case, fall on the side of HealthSouth. *See In re*

16

*National Airlines, Inc.*, 700 F.2d 695, 698 (11th Cir. 1983), *cert.*
*denied*, 464 U.S. 933, 104 S. Ct. 337 (1983).

### 3. Indirect Title VII Liability

Perhaps plaintiff's most compelling legal argument centers
around the case of *Sibley Memorial Hospital v. Wilson,* 488 F.2d
1338 (D.C. Cir. 1973), and its qualified adoption by the Eleventh
Circuit in *Pardazi v. Cullman Medical Center,* 838 F.2d 1155, 1156,
1157 n.1 (11th Cir. 1988), and *Zaklama v. Mt. Sinai Medical Center,*
842 F.2d 291, 294 (11th Cir. 1988).   Those cases, in essence,
recognize a Title VII disparate treatment cause of action against
an "employer" who "otherwise discriminate[s] against <u>any</u>
<u>individual</u>" with respect to his compensation, terms, conditions, or
privileges of employment because of such individuals race, color,
religion, sex, or national origin," even when the "individual" was
not employed by the employer. *See Zaklama,* 842 F.2d at 294;
*Pardazi,* 838 F.2d at 1156; 42 U.S.C. 2000e-2(a)(1).   These cases
have arisen in the context where one "employer" interferes with an
employment relationship or employment opportunities between some
individual and his employer or potential employer.   In *Pardazi,*
defendant hospital's alleged discriminatory denial of staff
privileges to plaintiff--who was not its employee--constituted a

17

possible violation of 2000e-2(a)(1) because the denial interfered with plaintiff's employment contract with another professional corporation that conditioned plaintiff's employment on his receipt of staff privileges at the hospital. *See Pardazi*, 838 F.2d at 1155-56. In *Zaklama*, a physician was discharged from his position as a resident doctor by his employer, Jackson Memorial Hospital, because of adverse recommendations of physicians of defendant's hospital. In both cases no direct employer/employee relationship was required to find defendant liable under Title VII for disparate treatment.

In the present case no interference with plaintiff's employment contract with Foundation has been proven. Rather, plaintiff complains of racial harassment. This harassment was supposedly tolerated by LSSI, which had a contractual duty to supervise plaintiff and Hospital's staff. Plaintiff also alleges retaliation, in a yet unspecified form. Defendant counters that LSSI's alleged inaction with regard to the alleged hostile environment in no way would subject it to liability under the *Pardazi/Zaklama* rationale. Defendant also asserts that it was not subject to liability for retaliation because plaintiff's immediate supervisor, a Mr. Henry, and the head of Human Resources, Ms.

18

Debbie Smith, were both Foundation employees at the time of the alleged retaliation. Ms. Smith contends that she alone, as a Foundation employee, had final say on all employment decisions, and that therefore, because LSSI was not a joint employer or a successor to Foundation's liability, and because it did not engage in any retaliatory conduct, it cannot be liable.

Surely, LSSI as a manager was in a position to quell an alleged hostile environment, as are most supervisory employees. The question becomes whether Title VII liability attaches to LSSI, as opposed to Foundation, when it fails to do its job. In the hostile work environment context employers are held liable when they knew or should have known that such an environment existed. However, LSSI was not Grant's employer. Liability will attach to LSSI only if this court extends the *Pardazi/Zaklama* reasoning to actions alleging racial harassment. While LSSI's allegedly poor supervision may have given rise to Foundation liability, the court reserves judgment on whether it would give rise to LSSI liability. Because the court finds that HealthSouth cannot be held liable on other grounds it resolves the case on these alternative grounds. With regard to the retaliation issue, plaintiff does not specifically address it. Because this court holds for HealthSouth on other grounds it similarly declines to address this issue with

19

regard to indirect liability.

### 4. Corporate Veil

Plaintiff attempts to "pierce the corporate veil" that separates HealthSouth from ReLife and ReLife from LSSI. Apparently, plaintiff's theory rests on an assumption that HealthSouth, which acquired ReLife <u>after</u> all alleged discriminatory acts occurred, acquired ReLife as a shell by which it could discriminate against plaintiff in the past through the shell of LSSI. This is perplexing. As already mentioned, such liability, after a merger or asset purchase, does not ordinarily attach to the buyer of the previous corporation. This court has already determined that HealthSouth is not a successor to LSSI's or ReLife's liabilities. Nevertheless, plaintiff wants these past alleged liabilities to be carried forward through both time and legitimate corporate walls and attach the liabilities to HealthSouth. If HealthSouth is really ReLife and ReLife is really LSSI then successor liability theory applies and HealthSouth is entitled to summary judgment for reasons articulated in section (C)(2) above. Because the liability arose in the past, and because LSSI and ReLife existed before HealthSouth acquired ReLife, it is disingenuous for plaintiff to argue that LSSI and ReLife were set up solely as "vehicle[s] to evade just responsibility" for

20

discrimination against plaintiff or that they were established to defraud plaintiff. (Pl. reply to def. motion for summary judgment at 20). The body of case law cited by both defendant and plaintiff address instances where a shell subsidiary was created and used illicitly by the corporation in an attempt to avoid liability that occurred while the parent owned and controlled the subsidiary. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235 (2d Cir. 1995); *Backus v. Watson,* 619 So. 2d 1342 (Ala. 1993); *First Health, Inc. v. Blaton*, 585 So. 2d 1331 (Ala. 1991); *Montgomery Health Care Facility, Inc. v. Ballard*, 565 So. 2d 221 (Ala. 1990); *Messick v. Moring*, 514 So. 2d 892 (Ala. 1987); *Duff v. Southern Ry. Co.*, 496 So. 2d 760 (Ala. 1986). Nothing the sort happened here. Accordingly, there is no reason to pierce the corporate veil in this case. Even if, *arguendo*, LSSI could be held liable under some theory of liability, when the alleged discriminatory deeds were done, HealthSouth had no interest in, or control of, LSSI. Plaintiff is looking to the present configuration of the corporations. While there might be some factual disputes about the subsidiary/parent relationship today, there was not when the acts occurred, thus HealthSouth never had the opportunity to "control" the actions of LSSI during the time of plaintiff's employment.

21

LSSI is still a viable corporation that plaintiff could have filed an action against, but chose not to.

Piercing the corporate veil is inappropriate in this case under any of the traditional veil-piercing theories: (1) inadequacy of capital of subsidiary; (2) fraudulent purpose in conception or operation of business; or (3) operation of the corporation as an instrumentality or alter ego. This is true even if, by some stretch, the veil might be pierced for acts committed by LSSI today. The corporate veil should be pierced only in limited circumstances, and this is not such a circumstance. Veil piercing is generally employed by courts to avoid fraud or injustice to the aggrieved party. In this case no such fraud or injustice exists. Accordingly, HealthSouth's motion for summary judgment is due to be granted.

## D. Conclusion

Defendant proffers two further arguments. The first relates to plaintiff's failure to name LSSI, ReLife or HealthSouth in his EEOC complaint, and the second relates to plaintiff's failure to join allegedly indispensable parties. Because the matter was decided on different grounds, the court need not address these issues. Plaintiff's judicial estoppel argument is without merit and does not prevent HealthSouth from asserting any of its defenses

22

in the present case. For the reasons articulated above, HealthSouth's motion for summary judgment is due to be granted and the action against it, dismissed with prejudice. Insofar as plaintiff's contention is correct that HealthSouth is now one and the same as Lakeshore Rehabilitation Hospital, that entity will be similarly dismissed with prejudice. This court acknowledges the importance of the proposition that plaintiff's avenues for redress of his Title VII and 42 U.S.C. § 1981 statutory rights should not be foreclosed on a technicality, but rules of procedure are as important as substantive rules. The court also recognizes that Title VII and other anti-discrimination laws should be liberally construed. Nevertheless, in the present case there are other viable defendants, including Foundation and LSSI who, for whatever reasons, plaintiff chose not to sue, and who could have afforded him adequate relief.

DONE this _10th_ day of April, 1997.

William M. Acker

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT

23